UNITED STATES *v.* DIAMOND MATCH CO.

*(District Court, D. Connecticut.   March 10, 1886.)*

INTERNAL REVENUE—MATCHES—PRIVATE DIES—STAMPS—INDEMNIFYING BOND
—REV. ST. U. S. §§ 3419, 3423—CIRCULAR NO. 136.

The bond required by circular No. 136, of date September 30, 1875, issued from the office of the United States commissioner of internal revenue, though not prescribed, is yet not prohibited by any statute; and, the object of the bond being to protect the United States against loss in the printing of stamps from private dies, authorized by Rev. St. U. S. § 3423, the authority to make the regulations contained in the circular, and to take the bond, is incident to the exercise of the duties of the commissioner.

At Law.   Action by the United States on an indemnifying bond given under circular No. 136 of the office of the commissioner of internal revenue.

*Lewis E. Stanton,* Dist. Atty., for the United States.

*Green B. Raum,* for defendant.

*To the District Court of the United States for the District of Connecticut:*

The undersigned having been, by written consent and stipulation by both parties in the above-entitled cause as on file, appointed referee to hear the testimony in said cause, and report to the court the facts as proved before him, reports that on December 4, 1885, he heard the said parties, with their witnesses, who were duly sworn, and with their exhibits, and by their respective counsel, Lewis E. Stanton, Esq., United States district attorney, for the plaintiff, and Green B. Raum, Esq., for the defendant, and he finds the following facts to have been proved, and to be true:

Prior to the act of March 3, 1883, which repealed the tax which was imposed upon matches and other articles by section 3419 of the Revised Statutes, the government kept on hand what were known as "general stamps," which were of a common design, and were for sale to and use by all parties who might have need for them; and also kept on hand, under the restrictions and subject to the existence of the bonds of indemnity hereinafter mentioned, private die-stamps, which were those printed from dies engraved for particular parties from special designs, each party providing at its own expense and owning its die and plate, and being alone entitled to receive stamps printed therefrom.   These private die-stamps were authorized by section 3423, of the Revised Statutes.   It was, during the existence of the tax imposed by section 3419, the custom of the government to keep on hand from two months' to three months' supply of general stamps; and prior to September 30, 1875, it was its custom also to allow, without any indemnity against loss, the printing of private die-stamps in accordance with the estimates which the die-owners furnished of their anticipated needs.   Shortly before that date it was discovered that large quantities of such stamps were on hand which had been printed in accordance with the estimates therefor, and

had never been purchased, and which never would be purchased, because the parties who had given the estimates, and for whom the stamps were printed, had gone out of business. (This history of the reason which led to the adoption of the provisions of the circular hereinafter mentioned was objected to by the defendant, was admitted, and the ruling of the referee admitting the same was duly excepted to.) Therefore the commissioners of internal revenue established the following regulation, promulgated in circular No. 136, dated September 30, 1875:

"It appears that it has heretofore been the practice of this office to print supplies of private die propriety stamps, in anticipation of orders therefor from the person, firm, or corporation furnishing the design, and, in the event of the failure or retirement from business from any cause of such person, firm, or corporation, the government has been subjected to a loss of the amount expended for paper and the printing and preparation for issue of the stamps left on hand. It is believed that this office is not warranted in subjecting the government to losses of this character, and that the printing of private die-stamps, before the receipt of orders therefor, should be discontinued, or that proper measures should be taken to secure the government against losses arising from such printing. In future, therefore, such persons, firms, or corporations as order stamps printed from private dies, and desire to avoid the delays consequent upon the printing and preparation of the stamps subsequent to the receipt of an order therefor, will be required to execute and file in this office a bond conditioned for the payment to the treasurer of the United States, for the use of the United States, whenever so required by the commissioner of internal revenue, of such sum or sums as may have been paid by the treasury department for the paper upon which the stamps are printed, together with the printing, perforating, gumming, and preparing for issue of such private die proprietary stamps, not exceeding an estimated three months' supply, as may be prepared under the directions of the commissioner of internal revenue, in accordance with the estimate and request of the person, firm, or corporation ordering the same. After the approval of the bond, or simultaneously with the filing thereof, an estimate of a three months' average consumption of stamps should be made by the person, firm, or corporation desiring stamps printed in anticipation of orders, and the same should be accompanied by a request that such number be printed, and kept continuously on hand awaiting orders therefor."

In April, 1881, the defendant became the successor of several match manufacturing companies which had previously existed, was thereafter the owner of 31 dies, was the largest match manufacturer in the country, and was continuously needing from 300,000 to 400,000 stamps per month during the busy season of the year. It was a convenience to it that the government should have on hand constantly an adequate supply of stamps for its needs, so that orders could be immediately filled; and it was also a pecuniary benefit not to be compelled to anticipate the demand, and to order the printing in advance from time to time, and to pay for the deliveries of stamps as they would be made under said orders. It required 21 days to fill an order. On the other hand, the government was under no obligation to print stamps in advance of orders, and run the risk of the loss which might naturally be incurred by reason of the preparation of private dye-stamps for people who would not want nor take them.

The defendant ineffectually endeavored to induce the commissioner of internal revenue to recede from the regulation contained in No. 136, and gave the bond hereinafter recited, so as to have its orders immediately filled, and not to be compelled to order the printing of its stamps in advance.    It gave the bond, not willingly, but for the purpose of gaining the advantages which it would forego if it did not comply with the regulation.    Had the bond not been given, it could have received stamps in the needed amount, but it would have been obliged to order and pay for them in advance, for a delay in filling their orders would have caused serious injury and loss.    To avoid any danger of delay, it was necessary that either the government or it should keep on hand a sufficient supply to meet its wants for 45 days.    Had it been compelled to keep so large a stock on hand, it would also have been necessary to raise a large amount of money, which would have subjected it to inconvenience, expense, loss of interest, and considerable pecuniary loss.    The regulation requiring the bond was designed to correct an unwise and uneconomical system of printing stamps, and was a discreet exercise of power, if, as is hereinafter found as a conclusion of law, the commissioner of internal revenue had such power.

Said bond is as follows:

"UNITED STATES INTERNAL REVENUE.

"Know all men by these presents, that we, the Diamond Match Company, a corporation of the state of Connecticut, and located in the town and county of New Haven, in said state, as *principal*, and George W. Crouse, of Akron, Summit county, and Thomas W. Cornell, of the same place, Alfred M. Barber, of the same place, as *sureties*, are held and firmly bound unto the *United States of America* in the full and just sum of *sixteen thousand dollars* lawful money of the United States, to which payment, well and truly to be made, we bind ourselves, jointly and severally, our joint and several heirs, executors, and administrators, firmly by these presents. Sealed with our seals, and dated this nineteenth day of April in the year 1881.

"*The conditions* of the foregoing obligation are such that whereas, the said the *Diamond Match Company* is a proprietor of proprietary articles, or articles subject to stamp duty under Schedule A, and under the provisions of section 3423, Revised Statutes of the United States, has furnished, without expense to the United States, its own dies or designs for stamps to be used thereon; and whereas, the said the *Diamond Match Company*, desirous of avoiding delays in the receipt of such of the aforesaid stamps as it may from time to time order, which would be unavoidable in case the same were not printed and prepared for issue prior to the receipt of the order by the commissioner of internal revenue; and whereas, the said the *Diamond Match Company* has requested, or may hereafter request, the commissioner of internal revenue to prepare and hold subject to its order, and to keep at all times on hand, an estimated three months' supply of the stamps aforesaid, the estimate of such supply having been made and filed with the said commissioner of internal revenue by the said the *Diamond Match Company*: now, therefore, if the said the Diamond Match Company shall, whenever requested so to do by the said commissioner of internal revenue, well and truly pay, or cause to be paid, to the *treasurer of the United States*, for the use of the *United States*, all and every such sum or sums of money as the commissioner of internal revenue shall certify to have been paid by the *United States* for the paper, printing, gumming, and perforating and preparing for issue, of the stamp

herein referred to, the same having been prepared in accordance with the estimate of the said the Diamond Match Company, which may at any time be found by said commissioner to have been printed for a longer period than three months, (exclusive, however, of such stamps as may have been printed within the three months next preceding the expiration, by repeal or otherwise, of all laws requiring the use thereof,) but not purchased by the said the Diamond Match Company, then this obligation to be void, and of no effect; otherwise to be and remain in full force and virtue.

"THE DIAMOND MATCH CO.    [L. S.]

"WM. H. SWIFT, President.

"L. W. BEECHER, Secretary.

"GEORGE W. CROUSE.         [L. S.]

"THOMAS W. CORNELL.        [L. S.]

"ALFRED M. BARBER."        [L. S.]

After circular No. 136 was issued, the practice of the parties who had signed the required bond was to send to the internal revenue department their estimates for a three-months supply of stamps, which amount was continuously thereafter kept in stock as nearly as possible. When an order for stamps was sent by the manufacturer, it was filled, and a corresponding order for new stamps was sent by the department to the printing-office. The practice of the parties who had not signed the required bond was to order stamps as they needed them, and the department directed the bureau of engraving to print the required number. Private die-stamps, as well as general stamps, were printed by the United States upon paper which it purchased. The paper and the printing were paid for out of an appropriation by congress. The defendant paid for its dies and plates.

On May 26, 1881, the defendant gave the commissioner of internal revenue its estimate of a three-months supply of stamps for its use, which was 68,750,000, and which amount it requested to be kept on hand. Afterwards, on January 27, 1882, the defendant requested that 1,890,-000 more stamps should be kept on hand. These amounts were, after the receipt of said estimates and requests, kept in stock. On March 6, 1883, the internal revenue department had on hand 69,988,736 stamps printed from the defendant's private dies. The trade in matches fell off between March 1 and July 1, 1883, and on July 2, 1883, the day after the repeal statute took effect, said department had on hand 43,133,741 stamps printed from the defendant's private dies at its request as aforesaid. On said day the commissioner of internal revenue informed the defendant, in writing, that the expense of manufacturing said 43,133,-741 stamps had been $4,364.37, and demanded payment of said sum. Said sum was the actual cost of the paper used, and of the printing, gumming, perforating, and preparing for issue said stamps.

None of these stamps were printed after April 1, 1883. They have never been called for nor paid for by the defendant, and have been canceled and destroyed by the government. The defendant did not ask for the printing of any stamps after March 3, 1883. No part of the amount of $4,364.37 has ever been paid, but is still due. The commissioner of internal revenue stated or certified to the defendant, on July 2, 1883, in

accordance with the conditions of said bond, that said money was expended as aforesaid for said stamps, the same having been prepared in accordance with the estimates of the defendant; and on July 9, 1883, said stamps were found by said commissioner to have been printed for a longer period than three months, and prior to the first day of April, 1883. Of said printing the defendant was informed July 9, 1883.

The defendant did not omit to purchase said stamps because of its failure or retirement from business, or on account of its laches, but because the demand for the purchase of matches fell off, on account of the repeal of said tax, after March 3, 1883.

Upon the foregoing facts I find, as conclusions of law, that the bond was not prescribed nor directed by any statute of the United States. Authority to take it was not given in direct terms, and it was not prohibited by any statute. The authority to make the regulation and to take the bond was incident to the exercise of the duties of the office of commissioner of internal revenue. I further find, as conclusions of law, that the said bond was and is a valid bond, and was properly and legally, and without any undue or improper compulsion or coercion, executed by the defendant, and was in legal sense a voluntary bond; and that the sum of $4,364.37, with interest thereon from and after July 9, 1883, is due from the defendant to the plaintiff.        N. Shipman, Referee.